1

                    UNITED STATES DISTRICT COURT
                      DISTRICT OF COLORADO

JO ELLIS,                        .  Case No. 25-cv-01115-STV
                                 .
          Plaintiff,             .
                                 .
vs.                              .  Byron G. Rogers Courthouse
                                 .  1961 Stout Street
MATTHEW S. WALLACE,              .  Denver, CO  80294
                                 .
          Defendant.             .
                                 .  September 17, 2025
. . . . . . . . . . . . . . . .  .  3:01 p.m.


       **TRANSCRIPT OF PROCEEDINGS HELD BEFORE THE HONORABLE
       SCOTT T. VARHOLAK, UNITED STATES MAGISTRATE JUDGE**


APPEARANCES:

For the Plaintiff:          Equality Legal Action Fund
                            By:  Margaret Haley Phelan*
                            PO Box 81465
                            Lincoln, IL 68501
                            (618) 680-0292

For the Defendant:          Ernst Legal Group, LLC
                            By:  Dan Ernst
                            217 East 7th Street
                            Denver, CO 80203
                            (720) 798-3667

Court Recorder:             Clerk's Office
                            U.S. District Court
                            1961 Stout Street
                            Denver, CO  80294

Appearances Continued:

Transcription Service:         AB Litigation Services
                               216 16th Street, Suite 600
                               Denver, CO  80202
                               (303) 296-0017

*Appeared by phone.

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

(Time Noted:  3:01 p.m.)

THE COURTROOM CLERK:  All rise.  Court is in session.

THE COURT:  This is 25-cv-01115.  Can I have entries of appearance, please?

MR. ERNST:  Good morning, Your Honor.  This is Dan Ernst on behalf of Defendant.

THE COURT:  Good morning.

MS. PHELAN:  Good afternoon, Your Honor.  This is Meg Phelan on behalf of Jo Ellis.

THE COURT:  And good afternoon.

So we are here today on Document Number 16.  This is the special motion to dismiss filed by Defendant pursuant to the anti-SLAPP statute.  I have reviewed in great detail both the motion, the response, and the reply.  And so there's no need for anybody to repeat what has already been outlined in there.  But to the extent either side wishes to make further argument, I'll hear that argument today.  But again, there's no need to repeat what's already in the motions.

I'll hear from Defendant first since it's Defendant's motion, and then I'll hear from Plaintiff.

MR. ERNST:  Thank you, Your Honor.

THE COURT:  And let me ask you to address this.  You spent a lot of time in your motion and in your reply arguing two points.  One, the discussions of transgender

rights is a public topic, as well as discussions about the accident are a public topic. And two, a dispute as to whether the defendant was the first to publish this defamation or was later. And my question is, why do either of those matter?

And I'm going to give an example, and I'm giving it from the other end of the political spectrum just because I like to give counter examples. Let's say that there's a small online forum, six members, and one of those members happens to be Rachel Maddow, and one of the individuals in this small forum says, posts that President Trump just killed 67 lawful immigrants in his bedroom in the White House because he's anti-immigration. Clearly a false statement. Absurd statement. But it wasn't Rachel Maddow who said it first, it was this other person.

Rachel Maddow then goes on the air at MSNBC and spends a five-minute dialogue, or monologue, talking about her beliefs as to all the failures of President Trump's immigration policy. And then at the end she concludes with, and by the way, I've got reason to believe that he killed 67 people, 67 immigrants because he hates immigrants, inside his bedroom at the White House.

Clearly, everything she says for five minutes leading up to that statement is fine. It's protected speech, in the same way that the defendant talking about his views on

trans rights or anything else is protected speech. But why isn't that last statement clearly defamatory and why do I care that she heard that from somebody else? So if you can address those.

MR. ERNST: Yes, Your Honor. Thank you.

Because in America we're allowed to make mistakes. Negligence is insufficient to establish liability when it comes to a matter of public concern. If Rachel Maddow was lying, if she knew that Donald Trump was not the murderer in question, then yes, he or others could -- no, well he, sorry, could bring an action against her.

THE COURT: But they don't have, Plaintiff doesn't have to prove actual malice at this stage.

MR. ERNST: Plaintiff, at this stage, the burden to overcome the anti-SLAPP motion, as is established by *Creekside Endodontics*, *L.S.S. versus S.A.P.*, the burden on the plaintiff in an anti-SLAPP procedure is to make a showing of a reasonable likelihood based on admissible evidence that they will prevail.

In a case like this, what needs to be shown ultimately is actual malice by clear and convincing evidence. Okay. So at this stage, there has to be a showing that is not just plausibility, or not just a, as the response incorrectly says on Paragraph 13, it's not just that Plaintiff must show a legally cognizable claim.

This is not a standard motion to dismiss. Plaintiff has to show a higher standard, a reasonable likelihood of prevailing. And furthermore, because we're talking about actual malice, and actual malice has to ultimately be proven by clear and convincing evidence, even at this stage the Plaintiff must show, it is Plaintiff's burden to establish a reasonable likelihood by admissible evidence that they are going to prevail by showing clear and convincing evidence. They have not done so.

THE COURT: It's a reasonable likelihood.

MR. ERNST: A reasonable likelihood, yes.

THE COURT: Right. So some of the things that the Colorado courts have said that the Court can consider at this stage are things such as the adequacy of the investigation, which Plaintiff has set forth through the affidavit and supporting exhibits, that there wasn't really much investigation. Indeed, the Colorado courts have said if the clear and obvious way to prove this would be just to ask the person the truth of it, and they don't do that, that can support an actual malice claim.

MR. ERNST: Your Honor --

THE COURT: They've said the veracity or reliability of the source. And here, we largely have -- of the information leading to it. Here, we largely have an anonymous person providing that information.

MR. ERNST:  Your Honor, if I may?

THE COURT:  Go ahead.

MR. ERNST:  I think you're quoting from *Talley v. Time*.

THE COURT:  I'm not.  I'm quoting from *Coomer v. Salem Media of Colorado.*

MR. ERNST:  Okay.

THE COURT:  565 P.3d 1133.  And there's two *Coomer* opinions.  There's that one, and then there's *Coomer v. Donald J. Trump for President Inc.*, which is 552 P.3d 562, both of which involved anti-SLAPP challenges to defamation claims involving the allegations that there was some sort of malfeasance in the voting machines arising from the 2020 election.  Very similar to this case where you had unreliable information being provided, unreliable investigation into that information.

So unreliable source provides the information, unreliable investigation into that source.  And in both cases two different divisions of the Colorado Court of Appeals said that's sufficient to overcome a motion to dismiss under the SLAPP provisions.  Why don't I have the same thing here?

MR. ERNST:  Well, if we take a look, I think that there were other reasons in *Coomer*, but if we take a look at the case cited by Plaintiff, *Talley versus Time*, which is a Tenth Circuit case, and we look at its quotation of *St. Amant*

*versus Thompson* -- and this is on page, this is the citation for *Talley versus Time* I'm looking at is 923 F.3d 878895.

It quotes the U.S. Supreme Court, *St. Amant versus Thompson*, that says, "Reckless conduct in this context of establishing absolute" -- sorry, "actual malice. Reckless conduct is not measured by whether a reasonably prudent man would have published or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of the publication."

And it says then, you know, the court in *Time versus Talley* says, "A plaintiff does not create a jury question of actual malice by showing that a publisher failed to investigate before publishing."

To say that there were --

THE COURT: Well, let's go further to what -- let's finish the quote.

MR. ERNST: Okay.

THE COURT: Because you don't finish the quote.

MR. ERNST: Okay.

THE COURT: It says, "Actual malice may be found when a publisher had," quote, "subjective awareness of probable falsity. For example" --

MR. ERNST: For example. Yeah.

THE COURT: -- "evidence that a publisher knew its

sources were unreliable but made no attempt to verify the information."  We have that here.

"Or that a publisher knew it was publishing contested allegations but deliberately ignored sources or information that might reveal what actually happened may establish actual malice.  Other examples include a story that is fabricated by the defendant."

Now, the defendant here denies that, and at this stage we don't have actual evidence that he knew that the information was necessarily false, such as a confession.

"Is the product of his imagination or is it based wholly on an unverified anonymous telephone call."  This is worse than, this is just as bad as that.  This is an unverified posting somewhere out there on the internet.

MR. ERNST:  Eighty thousand postings, Your Honor. I mean, and Grok, you know, abrogating --

THE COURT:  Except --

MR. ERNST:  So, I mean, to say --

THE COURT:  Except what his initial statement is, is, I relied upon this -- I can't remember the name of the email, but it's somewhere in here.

MR. ERNST:  He relied upon his friends alerting him to the allegation that Jo Ellis was the pilot in question.  And that occurred around midnight on January 31st, okay?  And if we look at the complaint, if we look at the

complaint, Paragraph 20, we identify in that complaint the initial posting. And this is on Page 11 of the complaint, okay? And in that screenshot that the complaint identifies as the initial posting, the timestamp is cut off, but in her response, Plaintiff Exhibit 2 -- so if we look at Docket Number 22-2, we see that indeed that initial posting is timestamped at midnight on January 31st. Okay.

THE COURT: But I have an allegation from the plaintiff in an affidavit. It says, "Once his lies were discovered, Defendant instantly blamed other ex-users, namely a user with handle @fakegaypolitics. And then, later, he goes back, because I guess @fakegaypolitics says, that wasn't me, I posted after. And then he goes back and changes his story.

MR. ERNST: Well, Your Honor --

THE COURT: Why isn't the fact that he changes story --

MR. ERNST: I don't see that he changed his story, ever. And I do see that at Exhibit 22-9, where we're talking about @fakegaypolitics, @fakegaypolitics shows that Grok was saying that it was Jo Ellis at that earlier time. But also, he points to a post, not Matt Wallace's, but to Random Maga (phonetic) as the origin of his understanding that it was Jo Ellis. And so that has no bearing in showing that it was Matt who initiated --

THE COURT:  But now we're getting into detailed factual disputes, which I can't get into.

MR. ERNST:  Well, I mean, it's not -- I mean, Jo Ellis just can say Random Maga is Matt Wallace with no foundation, and then create a jury?

THE COURT:  Well, yes.  At this stage what the Colorado courts have said is I cannot get into an analysis of factual disputes.

MR. ERNST:  I mean, you have to make a determination if there has been shown, you know, a sufficient basis to allow this claim to continue based on admissible evidence, and admissible evidence that the Plaintiff is going to be able to show by clear and convincing evidence that --

THE COURT:  But why isn't --

MR. ERNST:  -- this man originated the, you know, originated the -- or that this man had actual malice in his postings that, you know, 10,000 -- not 10,000, but 80,000 people posted as well, thinking that it was Jo Ellis.

THE COURT:  So if --

MR. ERNST:  And way before he ever did.

THE COURT:  If I get 80,000 anonymous phone calls saying it was this person did this, is that sufficient that I don't have to do anything further to investigate?

MR. ERNST:  It's sufficient to establish that you did not have actual malice, which is a mental state of either

knowing or having a very serious suspicion that this was false.

THE COURT:  Let me go back to my initial example.

MR. ERNST:  Yeah.

THE COURT:  Let's say, because as I read everything that you've provided into evidence at this point, the 80,000 number that you're talking about said Plaintiff was the one who flew that helicopter.  I don't have 80,000. I don't have one that's been submitted to me that says, and did so intentionally to, you know, as some sort of terrorist plot.

MR. ERNST:  Many of those posts do, Your Honor.

THE COURT:  You haven't presented me with one.

MR. ERNST:  I think that they have.

THE COURT:  The ones that you cite in your motion and your reply all say that she was the pilot, but they don't say, and this was a terrorist plot to --

MR. ERNST:  Many of them talk about the intentionality of the --

THE COURT:  Well, point me to one that says that this is some sort of terrorist plot.  Tell me which exhibit.

MR. ERNST:  Okay.  Let's take a look at the exhibits.

THE COURT:  Because what the President said was this has something to do with diversity.

MR. ERNST: Okay. So, Your Honor --

THE COURT: Go ahead.

MR. ERNST: Your Honor, I'm sorry to jump in. But I mean, the very first, the very first exhibit that's cited as part of the affidavit is this guy, Francesco @fakegaypolitics who says, "The pilot of the Blackhawk has been identified as Chief Warrant Officer Jo Ellis, a transgender woman. Jo Ellis has served in the Virginia National Guard for 15 years and transitioned while serving as a pilot. Jo has been making radicalized anti-Trump statements on socials." Okay? This is, you know --

THE COURT: Doesn't say, and therefore, this was a terrorist plot.

MR. ERNST: What's the inference there?

THE COURT: I mean, maybe you infer that --

MR. ERNST: I mean, what is the connection?

THE COURT: You don't want me to make the same inference to your client's statements. You say he didn't actually say it was a terrorist plot.

MR. ERNST: Right.

THE COURT: But now you're saying I should make the same inference going the other way.

MR. ERNST: Well, I'm just saying -- listen, I'm just saying that the question of actual malice is a question of the subjective content of the speaker.

THE COURT:  I agree with that.  But what the Colorado courts have told me I can consider at this stage in trying to determine whether we can reasonably, there's a reasonable probability that down the road they can prove by clear and convincing evidence is things such as inconsistencies.  And here, we have, according to the affidavit of the Plaintiff, these statements.  And I think every one of this is likely to be admissible.

Now, I'm not making an ultimate admissibility determination now, nor do I need to.  But it's that on January 31st, 2025, at 12:29 p.m., Defendant reposted user @fakegaypolitics post and claimed, "It was the first account who reported what we know is false about me.  Defendant subsequently provided excuses as to why the rumors about my involvement seemed believable.  It was obvious that he realized he had posted blatantly defamatory statements and had to cover his tracks as soon as possible.  However, after Defendant blamed user @fakegaypolitics, that user immediately produced screenshots of other users posts about me, including Defendant's on which he relied when reposting the rumor."

MR. ERNST:  There's nothing in the record that shows that it's Defendant's post that @fakepolitics relied on.

THE COURT:  Okay.

MR. ERNST:  @fakepolitics relied on this guy

Random Maga.  @fakepolitics, I mean, this is a mischaracterization by Plaintiff of what's happened. @fakepolitics was saying, it wasn't me.  I didn't start it. But he wasn't saying that it was Defendant.

THE COURT:  Okay.  The other things I can consider are the reliability of the sources.  They're all random anonymous people that were that he has relied upon for this.

The other thing that --

MR. ERNST:  Your Honor, if I can -- if I can?

THE COURT:  Go ahead.

MR. ERNST:  What was shown in what was being discussed in *Tally versus Time* is the subjective person -- it's not an objective negligence standard that he relied on somebody.

THE COURT:  I know that.

MR. ERNST:  Let me, please.  No, no, no.  But it's that he knew it was unreliable, the anonymous caller, and he published it anyways.  And that's not what we have here.

THE COURT:  I know.  But the Colorado courts who I'm bound by --

MR. ERNST:  Yes, Your Honor.

THE COURT:  -- have said I can consider all of these things that an objective person would look at in order to conclude that at this stage down the road they can prove subjectively that he had actual malice.  That's what the

Colorado courts have told me.  You want me to ignore what they're telling me.

MR. ERNST:  No, no, I don't.  But I want you to, I want you to --

THE COURT:  I mean, *Coomer* is as close -- the two *Coomer* opinions are as close as we can possibly get to this. You say 80,000 users did it.  In the *Coomer* opinions how many people in the 2020 time frame were saying that there's something going on defamatory with or something going on illegally with the voting machines?  It was probably millions of people posted that.  Yet, the *Coomer* cases said the fact that it was unreliable people who were posting this, and there was no investigation done, that is sufficient at this stage.  What distinguishes this from *Coomer*?

I got two different Colorado Court of Appeals that, on nearly identical facts as this, have said it's sufficient to go forward.  So you tell me how I distinguish *Coomer.*  Or I could just say *Coomer* is wrong and that's not how the Colorado Supreme Court would go out.  And if you want me to make that, then make that clear, because obviously it's in making the eerie leap what I have to decide is what the Colorado Supreme Court would say, not but I'm guided by the Colorado Court of Appeals.

MR. ERNST:  So, Your Honor --

THE COURT:  So if you want me to just say *Coomer's*

wrong then --

MR. ERNST:  No, no, no, no, I don't.  I don't.

THE COURT:  Okay.

MR. ERNST:  But I do want you to take --

THE COURT:  So what distinguishes this from the two *Coomer* opinions?

MR. ERNST:  What distinguishes this case is that this man explained why it wasn't just random people.  It wasn't just the tenth or 80,000 people on X.  As was mentioned in his affidavit, there were the Daily Mail, there were a bunch of news organizations, there was --

THE COURT:  Same with *Coomer.*

MR. ERNST:  Anne Vandersteel.  There was Grok.  There was a lot of, there was a lot of --

THE COURT:  Fox News was saying in *Coomer* that there's problems with the voting systems.  So, yet, they said this is sufficient to move forward.  Fox News got sued for saying that.  So, again, find me something that distinguishes these cases.

MR. ERNST:  I mean, I think that we must be misinterpreting *Coomer*.  I'm not saying that the Court was wrong.  I'm just saying that we must be misinterpreting *Coomer* because there has to be some evidence that this guy's mental state was that he knew that it was false, or at least had some kind of suspicion that it was false.

And what's pointed to in the response, the Plaintiff's response, and the Plaintiff's complaint, is nothing of the sort.  I mean, there's a screenshot of his first posting, which is initially cut off in Paragraph 20. And then, later, in Plaintiff's own exhibits shown to be at midnight, in keeping with his explanation of how he came to post about, you know, Ms. Ellis, and, you know, and so it's not Plaintiff -- it's not Defendant's burden at this time to prove his innocence, or to prove his mental state.

He's given plenty that should be convincing to the Court, but it is Plaintiff's burden to provide some admissible evidence that provides more than just a speculation that he had a mental state of knowing that what he was posting was false, or had a, you know, very serious suspicion that it was false and did it anyways.  None of that is here.

THE COURT:  Okay.  So let's go through.  So this is the most recent *Coomer* position.  And what you're saying is, my client submitted an affidavit saying he didn't believe it to be false.

MR. ERNST:  I'm saying that Plaintiff has --

THE COURT:  Same with *Coomer*.

MR. ERNST:  -- has failed to provide any admissible evidence to establish his --

THE COURT:  Well, let's look at what --

MR. ERNST: -- mental state.

THE COURT: Let's look at what was relied upon in *Coomer*. In *Coomer* the Court says, "We acknowledge Corporon," who is the defendant, "positioned that he believed the statements were true. While that is certainly an argument for the jury, it's not enough to prevail at this stage of the proceedings."

So then, let's look at what courts have relied upon. In *Coomer* the things relied upon were:

One, there is no indication that Corporon attempted to contact Coomer. Quote, "The most obvious source of corroboration or reputation."

We have that here. There's no attempt to contact to dig any further to look into this.

"And more to the point, Corporon does not argue that he made any investigation." Again, I've got the same thing here.

Those two with respect to that defendant, those two things alone, the Colorado Court of Appeals said is sufficient at this stage.

What else do we have here? Well, what *L.S.S.* tells us we can look to is evidence of the defendant's anger, hostility -- "anger and hostility toward the plaintiff may serve as circumstantial evidence of actual malice to the extent that it reflects on the subjective attitude of the

publisher."

Well, we have that here.  And again, these alone are not actionable, but they can serve as evidence of anger. We have the anti-trans statements that he's made in the past. Again, that is not actionable, but it can serve as hostility or anger towards the plaintiff in this case.

So again, when I've got *Coomer* that says in and of itself, the failure to conduct any investigation was enough to survive, how do I not have enough to survive here?

MR. ERNST:  Because it doesn't, I mean, his quote-unquote "failure to investigate", there was not a failure to investigate.  He looked at plenty of evidence in the record to corroborate that it was Jo Ellis.  Not only that there were other articles by reputable publishers making that mistake, not only --

THE COURT:  But we have to go one step further, because it's not enough just for -- we have to look at the entirety --

MR. ERNST:  Are all of the --

THE COURT:  -- of the defamatory --

MR. ERNST:  Are all of these sources unreliable?

THE COURT:  But we have to look at the entirety of the defamatory statement, and the entirety of the defamatory statement is not just Plaintiff was flying this helicopter. It's, and intentionally did the terrorist attack.

MR. ERNST:  Yes.  And there was a basis for that, and --

THE COURT:  You have not shown me any --

MR. ERNST:  But there was a --

THE COURT:  -- articles that say this.

MR. ERNST:  But, Your Honor, there was a basis for his inference, which was that she made this, you know, she made this letter and she made this podcast about her despair.  And, you know, it's only two days before --

THE COURT:  And that's sufficient to make it a reasonable conclusion that there was a terrorist attack?

MR. ERNST:  There was the strange path that the helicopter was taking.  That it passed right in front of a runway.  That it was erratic.

THE COURT:  Okay.

MR. ERNST:  I mean, there were inferences made.  There were mistakes made, yes.  But to say that this is -- you know, I think we're on the wrong track if we're trying to talk about something that's ultimately going to get us to negligence.  Because really what we need is some sort of evidence on the Plaintiff's side to support the inference that he lied or that he knew, pretty much, and suspected that the evidence that he was being provided was false and nevertheless published.  And that is not what we have here.

And we have to keep in mind that the burden is on

the Plaintiff.

THE COURT:  I know.

MR. ERNST:  And what the Plaintiff has said, the Plaintiff has provided is, you know, number one, that picture of, here is his initial posting.  And because it was, you know, first off, he must have fabricated it.  But then we respond, that's not true.  Because he didn't, he wasn't the first one, we know that.

THE COURT:  So give me your best way for me -- if I'm coming out and I'm going to issue my opinion today.  I'm going to do it orally because I think it's important under the statute to try to get a quick ruling.  If I come out in half an hour and I give my ruling, give me my best way when I say, the Court has independently come across the two *Coomer* opinions, these are distinguishable because X.  What is my X?

MR. ERNST:  They're distinguishable because in this case Matt Wallace did indeed make a mistake, but it wasn't --

THE COURT:  Same in *Coomer*.

MR. ERNST:  Yep.  That's right.

But in this case, he relied on substantial evidence of his inference.

THE COURT:  What substantial evidence of his inference?

MR. ERNST:  Well, I think we can agree that there

was substantial evidence that he relied on to make the incorrect inference that Jo Ellis was the pilot.  Can we agree to that?

THE COURT:  Well, I'm not sure we can agree to that because I'm not sure that what you've pointed me to, which is a bunch of people on X speculating that it's the pilot, is sufficient.  Now, here today, you've argued a few other things --

MR. ERNST:  And also, the daily wires -- the Daily Mail, and other publications, and other news organizations.  And in particular -- what's her name?  She's a journalist that he follows, Ann Vandersteel, and Grok, which is, you know, the, you know, the AI of X.  So, if you do conclude that he was not, you know, given all that evidence for the inference that Jo was the pilot, does not -- this is not evidence, or does not lead one to believe that he suspected, nevertheless, that it was false and published that Jo was the pilot.  And that's all we need here.  Okay?  Let's go to the next, then.

THE COURT:  Well, and the pilot and was conducting a terrorist activity.

MR. ERNST:  And the next step.  The next step, his inference that it was a terrorist attack.  Why did he believe that, rather than know that it wasn't, and suspect that it wasn't, and nevertheless published it?  The reason is given

in his affidavits.

The reason why he believed that it was a terrorist attack, that it was intentional, was because he saw the erratic flight of the pilot of the helicopter.  He saw that the crash happened as there was a smooth, you know, commercial flight into a runway where there shouldn't be a helicopter, you know, so close to the ground right before a runway.  He saw that Jo Ellis made public statements about her despair and anger about serving for 15 years honorably for our country and now suddenly being dismissed.

And he's also, you know, he also believes that transgender ideology has created a certain class of, a certain, maybe very, very small class of ideologues who are ready to conduct a terrorist act.  And it might be a mistake the same way that you might jump to a conclusion that, you know, if there happens to be somebody named Mohammed who's part of an accident that this, you know, he's a member of an ideologically radicalized group.

So these are inferences that were mistaken, but it is not evident -- there's no evidence.  Because we don't believe in his train of thought, that's not evidence that he himself had a subjective mindset that he knew that it was false and published it, or suspected strongly that it wasn't and published it.  And the logic of being somebody who comments on things also should be brought to bear here.

If you make a public proclamation that some, you know, that Jo Ellis was the pilot in a fatal crash, and you know or suspect that it wasn't, and you know that as soon as Jo Ellis hears that, you know, she wasn't, she'll come forward and say it wasn't me.  So, you know, it --

THE COURT:  So let me ask you this.

MR. ERNST:  Yes, Your Honor.

THE COURT:  If we have a defamation defendant who makes an admittedly grossly inaccurate statement --

MR. ERNST:  A false statement.

THE COURT:  Right.  Grossly false statement and --

MR. ERNST:  How is it grossly?  I mean, it's false.

THE COURT:  Well, because it's false and it's not even close to being accurate.  I mean, not only was the Plaintiff not in the plane, not in the -- not the piolet of the heli -- she wasn't even in the helicopter.

MR. ERNST:  Okay.  I mean --

THE COURT:  But let's say we have somebody who makes a grossly false statement and they submit an affidavit that says, I thought it was true, and they provide a rationale.  You know, we could say that wasn't, you know, the most well researched rationale, but a rationale for.  In every case in which that happens do we never even make it to discovery under the anti-SLAPP?

MR. ERNST: No. Because the Plaintiff, in certain cases, will have some evidence, something, rather than, you know, rather than just attributing a Random Maga to him. Rather than showing a cutoff initial post, and then, later, actually presenting the post so that it shows that it's posted around midnight on January 31st -- I mean, the Plaintiff has the burden here because of the extraordinary expense in this type of litigation.

And so that's what our Colorado legislators are trying to create a method whereby they shift the burden early on onto the plaintiff to make, not just a plausible claim. And by the way, I don't even see a plausible claim, honestly. But not just a plausible claim, but to show a reasonable likelihood of prevailing.

And there is no, I mean, there's no admissible evidence that shows that this man had the subjective mental state of knowledge or that he somehow, you know, suspected overwhelmingly that it was false and nevertheless published it. That's not --

THE COURT: Well, let me ask Plaintiff to address that. Point me to each piece of evidence. Because again, I can't just rely upon the allegations in the complaint. I have to point to evidence. Point me to each piece of evidence that you assert that at this stage of the proceedings are sufficient to lead me to believe that down

the road a jury could find actual malice.  Because that's --

MR. ERNST:  By clear and convincing evidence.

THE COURT:  Because I don't find -- I'll tell both sides, I'm not buying for one second the there's no damages here portion of it.

MR. ERNST:  Okay.

THE COURT:  I think the real question here is the actual malice portion.

MR. ERNST:  Yes, Your Honor.

THE COURT:  So let me ask Plaintiff, point me to each fact that, you know, I'll say the same question that I asked Plaintiff, when I come back out in 20 minutes -- or Defendant, yeah, Defendant, when I come back out in 20 minutes and issue my order, point me to each fact that I would turn to to say this could support actual malice, this could support actual malice.

MS. PHELAN:  Yes, Your Honor.  Thank you.

May it please the Court.  So what I can do is I can go through with the different factors that can go into a circumstantial evidence analysis of actual analysis.  If that works for you, sir.

THE COURT:  Sure.

MS. PHELAN:  I don't want to restate everything I've put in mine, but I think that's the easiest way --

THE COURT:  No, I don't want --

MS. PHELAN:  -- to do this.

THE COURT:  -- you to, either.  But, yeah, if you take the factor and what piece of evidence, again not allegation, but piece of evidence, you have that supports that.

MS. PHELAN:  Yes, Your Honor.

So, I think we have overwhelming circumstantial evidence to prove that there is a reasonable likelihood that we can prove by clear and convincing evidence at trial there is actual malice.

So Your Honor has discussed the reliance on facially unreliable sources, and I think what goes -- and I don't know how to say this better, so something not in our -- something against the defendant's favor is in his own affidavit he states over and over again, there were these posts, but he doesn't actually even say that he relied on them.

And I think the timeline is what is in question here, but if we look at that factor alone, the reliance on these sources, so the defendant mentions random X posts.  He doesn't actually claim that there's a reliance on those.  And most of them are anonymous.  I think one had one follower. It might be a chat bot.  We can't even prove that it's a real individual.

Also, all of the facts surrounding the narrative

that the defendant has put forth in this, Your Honor.  So, first, he claims that the information he receives came from his brother, which he does not have.  I assume he meant friend, or he changes that to friend later when he's talking about the user @JackWallace888 --

THE COURT:  Well, it's --

MS. PHELAN:  -- which seems like a profile -- yes, Your Honor?

THE COURT:  I mean, the term "brother" in online forum, you know, these online forum chats involving, you know, political views, I don't think he's -- I wouldn't have read that as suggesting that it's his actual brother.  I would have suggested it to mean, especially when we're talking about, you know, somebody engaged in podcasts and that, it's a follower.  It's somebody who follows me.  So I'm not sure that that's a false narrative.

So go ahead.

MS. PHELAN:  Yes, Your Honor.

So I think my argument in terms of that being a false statement is that the profile is literally the same as the defendant's, except the name is Jack instead of Matt.  So it seems that most individuals online believe that is actually Matt Wallace.  But when he calls him his brother, that he is portraying that as his, quote-unquote, brother, because they have the same name, essentially.

That aside though, Your Honor.  Then it turns into, well, okay, now I'm blaming this on someone else.  Once I've been caught in this lie, I'm blaming this on a user called @fakegaypolitics.  Which, if there is an unreliable source, I would say that is an unreliable source.  That source also does not have nearly as many followers.  Well, it's not even an active account anymore, but it does not have nearly the amount of followers that Matt Wallace does.

Also, claiming that because AI said it was true, that that must be true.  These other users are most of the -- a couple of them that he pointed to in the attachments to his affidavit are that he relied on a couple of users who are known for putting out propaganda in foreign countries and peddling false information and having anti-trans narratives.

So I think it's a combination of all of those changing stories and the unreliability of the sources, just in terms of that factor, Your Honor.

THE COURT:  Where is the change of story?  Because what the defendant is arguing is that the post from -- let me just find it here.  What Defendant is arguing is that this @fakegaypolitics, that the defendant initially said, this is where I got it.  And then @fakegaypolitics provides a post from another user who, Defendant is also posting this prior to @fakegaypolitics posting it.  And what Defendant is saying is those other users aren't him.

What is your evidence that one of the individuals who posted prior to @fakegaypolitics posting it is actually Defendant?

MS. PHELAN:  Yes, Your Honor.

So one thing that I would like to point out is if you look at Defendant's Exhibit E, because they have a screenshot of that Random Maga, that's actually a video.  So that is a video that was uploaded on X by @fakegaypolitics showing the, quote-unquote, sources or accounts that he referenced when making his post.

And obviously I don't have affidavits.  I don't want to go outside of what was briefed.  I have actually spoken with that individual.  I just don't have an affidavit at this juncture.  And once we were able to get to discovery and trial, those are things that I would be able to prove.

MR. ERNST:  That can't be considered.

THE COURT:  I am not --

MR. ERNST:  You have to --

THE COURT:  I'm not considering anything that hasn't been submitted.

My question though is, I'm looking at Exhibit E. Who's Random Maga?

MS. PHELAN:  If you look in the -- another random account that is on X, Your Honor.

THE COURT:  Okay.

MS. PHELAN:  And what I'll say is, if you look in the bottom, left-hand corner of that screenshot, it shows 1 minute and 24 seconds out of 1 minute and 30 seconds, because that's a video that's a scroll.

THE COURT:  But what does that -- but how does that --

MS. PHELAN:  That @fakegaypolitics posted.

THE COURT:  But how does that show that the defendant lied about what he relied upon?

MS. PHELAN:  Oh, Your Honor, I'm sorry if I confused.  So my point in the changing stories is that it goes into another factor that can be considered in circumstantial evidence and that when you're looking --

THE COURT:  I agree.

MS. PHELAN:  -- at an individual --

THE COURT:  I agree, but I'm not following how the story's changing.  Tell me what story one was, and then what story two is, and then how those two are inconsistent with each other.

MS. PHELAN:  Yes, Your Honor.

Okay.  So when the defendant made his original post, it was my brother @jackwallace888 just told me, and I don't have it in front of me to look at it, but he's claiming he got the information from his brother, or his friend, whatever we want to call user @jackwallace888.  That's what

he says on X.  Those are the defendant's own words.

THE COURT:  And point me to where --

MS. PHELAN:  However --

THE COURT:  Point me to --

MR. ERNST:  This is Plaintiff's Exhibit 2.

THE COURT:  Okay.  Okay.  And then --

MR. ERNST:  My brother, @jackwallace, who is a different person, by the way, just found out that helicopter pilot was a transgender.

THE COURT:  Okay.

MR. ERNST:  They aren't going to be able to hide this much longer.

THE COURT:  Okay.

MR. ERNST:  And it's time-stamped midnight.

THE COURT:  And then turning back to the Plaintiff, tell me what's inconsistent with that.  Are you saying that now the statement that it was at whatever the account is, is the one who provided it that that's inconsistent?

MS. PHELAN:  Yes.

So then the next day, this is Plaintiff's Exhibit 6, the defendant says, this is apparently the first account who reported what we now know is false.  So he's (unintelligible) that --

MR. ERNST:  That's not inconsistent.

MS. PHELAN:  -- (unintelligible).

MR. ERNST:  I'm sorry, that's not inconsistent.

THE COURT:  Hang on.  I'll ask the questions.

MR. ERNST:  Sorry.

THE COURT:  Tell me how that's inconsistent.  If I say, again, I'll go back to my hypothetical that I gave before.  And if I follow up on Rachel Maddow's, you know, statement about Trump and I say, ah-ha, this is, you know, where I got my information.  I watched MSNBC last night, and I saw it on there.  And then I later do more digging and I say, wait, the first person to report this is person number one in this six-person blog.  That's not inconsistent. That's actually true.

MS. PHELAN:  Your Honor, I guess I interpret that as being inconsistent because of how -- I believe that another factor is an individual's refusal to retract.  And so to me, this goes hand-in-hand with how the defendant has dealt with this situation since he was caught in this lie.

Basically, it seems that he doesn't want to admit any fault in this whole terrorist attack rumor, and whoever is responsible for it, the defendant is basically pointing fingers and saying, it's not me.

MR. ERNST:  I'm sorry, he --

THE COURT:  Well, but that doesn't go --

MS. PHELAN:  And that's (unintelligible)

consistency (unintelligible).

THE COURT:  Well, but that doesn't go to the issue of whether or not he believed it to be -- whether he had actual malice.

The question I have to determine is, is there a reasonable probability that once we get to trial, once we get ready for trial in this case, or we go to trial, you can show by clear and convincing evidence actual malice.  And so far, and again, I don't want to -- I've been asking both sides a lot of questions, so I'm not trying to cut anybody short.  But, so far, you've provided me with facially unreliable sources, and I agree with that.

What else do you have besides the facially unreliable sources?

MS. PHELAN:  Well, Your Honor, it is my understanding that a refusal to retract, and I would have to find the case, is a factor that can be considered when you're accumulating circumstantial evidence in order to determine actual malice at this juncture.  Another (unintelligible) --

MR. ERNST:  Even if that were true, though --

MS. PHELAN:  -- (unintelligible) --

MR. ERNST:  Even if that were --

THE COURT:  Just hang on.  Hang on.

MR. ERNST:  Oh, I'm sorry.

THE COURT:  I will give you the last word on this.

MR. ERNST:  Okay.  Thank you.

THE COURT:  Go ahead, Counsel.

MS. PHELAN:  I was also going to say that a motive to defame can also be considered, and it can be considered circumstantial evidence of actual malice.  And you've talked about this, Your Honor, so I don't want to go into it too much, but the defendant admitted in his own affidavit, 16-6, Paragraph 34, that engagement brings him money on this platform, on X.  He has millions of followers online, and Your Honor talked a lot about his anti-trans rhetoric and the vitriol that he's used.

Now, as you have said, that is protected under the First Amendment generally.  He can have those views, but his viral posts are designed to sensationalize, and he constantly asks his followers to turn on notifications to ensure maximum engagement.  So in this scenario, part of that motive also is that he is the kind of person who thrives on and has built a career on spreading this type of anti-trans narrative, and he's (unintelligible) --

THE COURT:  But he's allowed to do that.

MS. PHELAN:  -- reach thousands of people.

THE COURT:  He's allowed to do it.

MS. PHELAN:  Yes.

THE COURT:  You may disagree with it.  Many people disagree with it, but that's what our First Amendment

protects.

MS. PHELAN:  Yes, I would agree with that, Your Honor.  But I think the point with the motivation to defame is that in this situation, the defendant didn't seem to care who the pilot was.  The fact that someone was -- he found out there was a transgender Blackhawk pilot that fit his narrative and gave him the motivation to say not only was she the pilot, but that she caused this terroristic murder-suicide and killed 67 people.  And that's what makes this loathsome and not just protected under the First Amendment.

This wasn't an accident on the defendant's part.  This is the business that he is engaged in.  And he didn't accidentally get this wrong.  He does these things for profit, and that is a factor that can be considered in the actual malice analysis.

THE COURT:  Anything else you want me to consider?

MS. PHELAN:  Your Honor, I think the only other thing that I would like to point out is something that you have said, and I just kind of want to drive it home.  It's that all of the defense's motion and reply, and even the defendant's affidavits, they're asking you to be the jury in this situation.  They're asking you to make findings of fact, which is not appropriate, as you've said, at this juncture.

And right now, the point is that Ms. Ellis is able to prove that there is a reasonable probability that she can

prove this by clear and convincing evidence at trial. And a reasonable probability is not the highest bar, like the defense is pointing out. It is less than 50 percent. And based on the information provided by the plaintiff at this point, I think we have shown more than enough. I mean, convictions have been sustained for less evidence than this when it comes to actual malice. And so I think that's the biggest thing there.

Unless you have any other questions, I don't need to necessarily go into everything that was already briefed, Your Honor. And I don't want to take up a lot of your time, but I do want to make sure I can answer all of your questions, sir.

THE COURT: I don't.

What I'm going to do is, I'm going to take a brief recess. I've obviously put a lot of time into this motion before oral argument. I want to look back at the cases that were cited. If I believe I can give an oral ruling here today, I will do so. If I don't, what I'll do is I will come back out in a few minutes, set it for a date for oral ruling again.

I normally don't rule orally on motions to dismiss, but I think that this statute as written encourages prompt rulings on these motions and I can simply rule faster if I rule orally.

It doesn't make the decision any less research, but what it does is it takes away my necessity to Bluebook and do all those different things that just simply make a decision longer.

So I'm going to take a brief recess now.

MR. ERNST:  Your Honor, if I could, just a quick response.

Number one, there was a retraction, as mentioned, both in, you know, in Plaintiff's briefings and ours.  Okay?  As soon as Defendant heard about the falseness of his, you know, his statement and his answering, I mean, his, you know, his contribution to that false statement, he made retractions.  Three of them, I believe.

Secondly, as pointed out a couple of times in his affidavit, he did not profit from this because there is a mechanism by which commentary on tragedy is demonetized in X.  He did not, he actually explicitly did not do it, as is his custom.  But also, there is a mechanism by which there is no money to be made commenting on this tragedy.

And then, finally, you know, if we're talking about motive, the motive of somebody to make a false statement that is going to be immediately debunked that's, you know, if, you know, Defendant's --

THE COURT:  But you don't know --

MR. ERNST:  I mean, Plaintiff --

THE COURT:  You know in hindsight it's immediately debunked, but only in --

MR. ERNST:  Well, I mean, if he knew that it was -- if he knew that that Jo Ellis was not the pilot, why would he say Jo Ellis is the pilot in a fatal crash?  If, like, we know that --

THE COURT:  Well, because he could easily have believed that Jo Ellis was not the pilot but was somebody else in the aircraft.

MR. ERNST:  Okay.

THE COURT:  And then that might not be discovered, right?

MR. ERNST:  That if Jo Ellis is dead, what's he say --

THE COURT:  Yes.

MR. ERNST:  He's saying that Jo Ellis is dead and --

THE COURT:  But how many were in the aircraft?

MR. ERNST:  There were three people in the aircraft.

THE COURT:  So if what he believed was Jo Ellis was one of the three, but not the pilot -- and again, we have to go one step further, but not doing it for terrorist motives, then that isn't immediately debunked, right?  That takes time in order for an investigation to determine who the

pilot was.  That takes time in order for the investigation to determine how exactly this happened.

And by the time that's all determined, you know, the goal, if the goal is to defame a transgender person, we know how these things spread over, you know, over the internet, even when it's shown conclusively to be untrue. Once it's spread, the goal of, you know, doing this because you have certain transgender views, the goal's been achieved at that point.  So I don't find that argument particularly persuasive.

Here's what I'm going to do.  I'm going to take a brief recess.  And like I said, if I don't believe I can issue a comprehensive order on this orally today, I'll continue it for oral ruling.  But I want to take a look at my notes real quick.

THE COURTROOM CLERK:  All rise.  Court is in recess.

(Recess from 3:58 p.m. until 4:40 p.m.)

THE COURTROOM CLERK:  All rise.  Court is in session.

THE COURT:  Please be seated.

I just want to make sure, do we have Plaintiff's Counsel still on the line?

MS. PHELAN:  Yes.  Yes, sir.

THE COURT:  Okay.  I'm prepared to issue my

ruling.  Give me just one second here.

(Brief pause)

THE COURT:  Okay.  I'm going to begin by quoting at length from *L.S.S. v. S.A.P.,* 53 P.3d 1280.  This was the first case, Colorado Court of Appeals case, to really address the anti-SLAPP statute.  It's been cited numerous times since then, but it lays out the standards of what the Court needs to do whenever one of these motions is filed.

And there the Court said as follows:

"In the first step, the Court determines whether the defendant has made a threshold showing that the conduct underlying the claim falls within the scope of the anti-SLAPP statute.  That is, that the claim arises from an act in furtherance of the defendant's right of petition or free speech in connection with a public issue."

Here, nobody disputes that that first step is met.

So as a result, then, I turn to the second step in which I need to review the pleadings and affidavits and determine whether the Plaintiff has established a reasonable likelihood of prevailing on the claim.

The *L.S.S.* court then looked to California's anti-SLAPP statute, which is substantially identical to the Colorado one, and said that it has been described as, "A summary judgment-like procedure in which the Court reviews the pleadings and the evidence to determine whether the

plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment."

The Court then went on to describe defamation and it said, "Defamation is a communication that holds someone up to contempt or ridicule causing them to incur injury or damage."

The elements of a defamation claim are:

One, a defamatory statement concerning another;

Two, published to a third party;

Three, with fault amounting to at least negligence on the part of the publisher;

And four, either accident ability of the statement irrespective of special damages or the existence of special damages to the plaintiff caused by the publication.

If a statement concerns a public figure or a matter of public concern, it is the subject of heightened standards.  This includes three modifications to the Plaintiff's burden of proof:

One, the plaintiff must prove the statement's falsity by clear and convincing evidence rather than by a mere preponderance;

Two, the plaintiff must prove by clear and convincing evidence that the speaker published the statements with actual malice;

And three, the plaintiff must establish actual damages even if the statement is defamatory per se.

In addressing these modifications, a couple of things must be kept in mind.  First, in determining whether a plaintiff has met their burden at the second step of the anti-SLAPP analysis the Court must accept the Plaintiff's evidence as true.

And now I'm quoting, or citing at length, *Coomer v. Donald J. Trump for President, Inc.*, 552 P.3d 562, a Colorado Court of Appeals decision from 2024.

"Unlike a 12(b)(5) motion, the Court does not accept the factual allegations in the complaint as true. Instead, to defeat an anti-SLAPP motion the plaintiff generally must go further and present evidence establishing a reasonable likelihood of success.  That evidence can and typically will come in the form of an affidavit.  But once affirmed in an affidavit, the plaintiff's assertions are no longer mere assertions, they are evidence, and that evidence must be accepted as true.  In other words, while we do not necessarily accept the plaintiff's allegations as true, we accept as true the plaintiff's evidence.

"Relatedly, in resolving a special motion to dismiss, the Court does not make factual findings, nor does it weigh the evidence or resolve factual conflicts.  Just as the Court may not make factual findings in resolving an anti-

SLAPP motion, it may not make credibility determinations.

"A plaintiff does not need to prove their case at the anti-SLAPP stage, nor does the Court decide whether the plaintiff will ultimately prevail, much less has prevailed, on their claims. Rather, a plaintiff's burden is to make a prima facie showing of evidence that, if later presented at trial, is reasonably likely to sustain a favorable judgment.

"The Court's role is limited to determining whether the plaintiff has met that threshold burden. If the plaintiff overcomes this initial hurdle, then the case proceeds as normal and this early screening determination has no further effect on the case."

And again, that was quoting with minor modifications at *Coomer v. Donald J. Trump for President, Inc.*

So with these principles in mind, I'll turn to the two disputed issues. The only two issues that are disputed are the second and third modification to the Plaintiff's burden of proof. Nobody disputes that the statement was false, and therefore, can show by clear and convincing evidence that it was.

I'll begin with the easier of the two disputed, and that is, did the plaintiff establish actual damages? And I conclude that there is a reasonable likelihood that Plaintiff can sustain a favorable judgment on this element.

In Paragraphs 19 and 20, at a minimum, of her affidavit, Plaintiff discusses the damages suffered from the defendant's conduct.  The Court must accept these statements as true.  And though the defendant can certainly challenge this as discovery proceeds, it is not incredible that Plaintiff would suffer reputational harm and the concomitant emotional distress that comes with it when Defendant issued a post seen 4.8 million times, as the affidavit states, the Plaintiff participated in a, quote, "trans terror attack".

I turn then to the harder of the two, which is, has Plaintiff made a prima facie showing on the actual malice component?  In other words, has she established a probability that she will be able to produce clear and convincing evidence of actual malice at trial?  And here, I find informative the Tenth Circuit's opinion in *Talley v. Time, Inc.*, 923 F.3d 878, at 896 and 97, a Tenth Circuit opinion from 2019, which talks some about actual malice.

Now, I do want to step aside for a moment because the question, again, is not whether or not Plaintiff has proven actual malice at this point.  Rather, the question is, as I indicated a moment ago, has she established a probability that she will be able to produce clear and convincing evidence of actual malice at trial?  Or, as the *Coomer* court put it differently later, has she demonstrated a reasonable likelihood, once she has marshaled all the

47

evidence, that she will be able to do so?

Again, turning back to the *Talley* decision, the Tenth Circuit said as follows, "A plaintiff does not create a jury question of actual malice by showing that a publisher failed to investigate before publishing.  Actual malice may be found when a publisher has a subjective awareness of probable falsity.  For example, evidence that a publisher knew its sources were unreliable but made no attempt to verify their information, or that a publisher knew it was publishing contested allegations but deliberately ignored sources or information that might reveal what actually happened, may establish actual malice.

"Other examples include a story that is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call.  Circumstances where the published statements are so inherently improbable that only a reckless man would have put them in circulation, or situations where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports."

Again, these are demonstrations of actual malice that could succeed at trial, but that's not what I'm being asked to decide here.  I'm being asked to decide is there a reasonable likelihood that once Plaintiff has marshaled all the evidence she'll be able to do so.

Now, admittedly, we have here an affidavit from the defendant saying that he did not know the information was false, and there's nothing that has immediately contradicted that, such as a confession saying that it was.  But again, the Tenth Circuit in *Talley* indicated that that was just one method in which one could prove actual malice.

And indeed, in *Coomer v. Donald J. Trump for President*, 552 p.3d 562, the Colorado Court of Appeals said a defendant cannot defeat a defamation claim simply by testifying what he posed he believed to be true.  So what do we have here that could lead me to the conclusion that once Plaintiff has marshaled all the evidence that she will be able to prove actual malice at trial?  In other words, what has been presented at this point to make that prima facie showing?

Well, first, we have Plaintiff's affidavit that lists several individuals who posted the Plaintiff was the pilot.  But I agree with Defendant that Plaintiff does not say in that affidavit that he relied upon each of those.  What he says is that each of these individuals also posted that Plaintiff was the pilot.  But he doesn't say that that's what he relied upon other than, one, which is @Ohiohomegrown.  But there's nothing to indicate that @Ohiohomegrown was a reliable source or had any personal information about the incidents.

And those are factors that were heavily relied upon by the Colorado Courts of Appeals in the two *Coomer* decisions, the *Coomer v. Donald J. Trump*, 552 P.3d 562, and *Coomer v. Salem Media*, 565 P.3d 1133.

And indeed, the reliance upon @Ohiohomegrown, when there's no information that Ohiohomegrown had any personal knowledge or was a reliable source at all, is very similar to the anonymous phone call mentioned by the *Talley v. Time, Inc.* case in which that alone could be sufficient to show actual malice at trial.

But we have more. We have Plaintiff made no attempts to verify the information that Plaintiff -- or excuse me, Defendant made no attempts to verify the information that Plaintiff was the pilot or was even on board. Again, this was critical in the *Coomer v. Salem Media* case. There, the Colorado Court of Appeals relied heavily upon the fact that the most obvious source of corroboration was not pursued, and that's the same thing here. There was no attempt to contact Plaintiff to attempt to corroborate this information.

And while there was some apparent investigation regarding the flight patterns mentioned in Plaintiff's affidavit, that type of investigation was minimal. It, again, did not go in any way to whether Plaintiff was the individual on board. And it's not clear from the affidavit

whether that research was done before the first post in this case, or it was done later to attempt to bolster the claim.

So we have, first, that the information was obtained from an unreliable source.  And I want to make one more comment on that, which is the @Ohiohomegrown post simply indicated that Plaintiff was on board and that Plaintiff identified as transgender.  It made no statement, and I think this was Exhibit X, that this was done in a terrorist attack.

So that appears to be just a wholly separate jump that the defendant makes in this statement.  Because again, even the research done on the flight patterns, it's not clear from the affidavit that that was done prior to the first posting or whether it was done later as further support for the posting.

Third, a court may rely upon the speaker's hostility to Plaintiff.  And that's both the *L.S.S.* opinion and the *Coomer v. Donald J. Trump* opinion.  And we have that here.

Clearly, Plaintiff has a strong anti-transgender beliefs.  He's entitled to those beliefs.  He is entitled to make any statements that he wants.  That is his first amendment protected right.  But I can consider the fact that he has those beliefs as indicated by the posts themselves to show that he has a hostility to Plaintiff.  And both the *L.S.S.* opinion and the *Donald J. Trump* opinion say that's an

additional factor that I can consider.

And I conclude that with those three findings, the first two of which were nearly sufficient on their own in the two *Coomer* opinions, the one *Coomer* opinion also talked about the fact that there was reporting that was reliable reporting that contradicted the false statement that was made that was not relied upon. But nonetheless, we have both of these factors here. I think first two are even stronger in this case than they were in the *Coomer* opinions. And we have the bias here.

And again, the reason I say they were even stronger is in this case the leap to this was a terrorist attack based upon the affidavits and the evidence put before me is a wholly unfounded leap. It seems to be one that Plaintiff himself made on his own.

To be clear, I am not in any way concluding that Plaintiff has proven actual malice. That's not the question. The question is, has she demonstrated a reasonable likelihood once she has marshaled all the evidence that she will be able to do so? I'm not permitted to weigh the evidence. I'm not permitted to discredit any of Plaintiff's evidence that she's been presented.

Indeed, in *L.S.S.*, the Court allowed the claims to continue despite finding the evidence, quote, "not terribly persuasive". But given the standards that I have to follow,

52

I conclude that Plaintiff has made the prima facie case, and I therefore deny the motion to dismiss.

That then leads us to next steps.

Should we set this for scheduling conference?

MR. ERNST:  Well, Your Honor, we have to discuss about the possibility of an interlocutory appeal.

THE COURT:  Okay.  Why don't we set it for a status in 21 days?  If I give you 21 days, is that sufficient time?

MR. ERNST:  I think we have, is it 49 days to file?

THE COURT:  I'm not sure off the top of my head.

MR. ERNST:  At least in state court, it's 49 days to file a notice of appeal.

THE COURT:  Typically, I don't know if the SLAPP statute has different days, so I don't want to speculate because it wasn't briefed and I'm not sure off the top of my head if there's a separate timeline.  Why don't we set it for status in 60 days, then.  Or roughly 60 days.

MR. ERNST:  Your Honor, are you going to write up the appeal?

THE COURT:  I'm not, but you can order the transcript.  As you can tell, I did write it up --

MR. ERNST:  Yeah.

THE COURT:  -- but it doesn't -- the reason I can

get it out quicker is I'm not worried about typos and I'm not worried about Bluebook style because my oral thing's not going to be published. When I write it up, I'm concerned it's going to be published and I don't want typos and other things, so I wanted to get this out quicker.

You can order the transcript, and my courtroom deputy will tell you how to do so. You'll obviously need to order the transcript to get my ruling if you do file the interlocutory appeal. So you can obtain that, and that's what the Tenth Circuit would rely upon.

How about, are the parties available November 6th at 10:30?

MS. PHELAN: One moment, please, Your Honor.

THE COURT: Okay.

MR. ERNST: Yes, Your Honor.

THE COURT: Okay. All right. Then we'll see everybody on November 6th. And obviously, if an interlocutory appeal is taken, I'll vacate that status date because there's no point in having it. If an interlocutory appeal is not taken, then at that status date, we'll talk about setting the scheduling conference on that. Okay.

All right. Thanks, everybody.

MR. ERNST: Thank you, Your Honor.

THE COURT: I also want to say, I do appreciate -- I try to remember to say this in cases where it applies. I

do appreciate the briefing on this issue.  I think both sides presented a strong briefing and presented each of your arguments to the greatest extent that each side could, and so I appreciate that.

I'm not saying it made the decision any easier.  I think these are fairly complicated issues on a statute that is fairly new, but I do appreciate the briefing on it, so thank you.

All right.  We'll be in recess.

MS. PHELAN:  Thank you.

THE COURTROOM CLERK:  All rise.  Court is in recess.

(Time noted:  4:58 p.m.)

* * * * *

CERTIFICATE

I, RANDEL RAISON, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, to the best of my ability.

_____          September 29, 2025

Randel Raison